1

2

**E-Filed 7/8/2010**

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8               FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                            SAN JOSE DIVISION

10

11   KAREN L. JONES-BOYLE, individually and on        Case Number CV 08-02142 JF (PVT)
     behalf of all others similarly situated,
12                                                     **ORDER[1] GRANTING MOTIONS
                    Plaintiff,                         TO DISMISS WITH LEAVE TO
13                                                     AMEND IN PART[2]**
              v.
14                                                     [re doc. no. 76, 77, 78, & 95]

15   WASHINGTON MUTUAL BANK, FA, and
     JPMORGAN CHASE BANK, NA
16
                    Defendants.
17

18

19        Defendants Federal Deposit Insurance Corporation ("FDIC"), as receiver for Washington

20   Mutual Bank, FA ("WaMu") and JPMorgan Chase Bank, NA ("JPMorgan") move separately to

21   dismiss the second amended complaint ("SAC") of Plaintiff Karen Jones-Boyle ("Jones-Boyle")

22   pursuant to Fed. R. Civ. P. 12(b)(6). JPMorgan also moves to dismiss pursuant to Fed. R. Civ P.

23   9(b) for failure to plead fraud or misrepresentation with the requisite particularity. The FDIC

24   moves to strike Plaintiff's class allegations pursuant to Fed. R. Civ. P.12(f) and 23(d). The Court

25

26        [1] This disposition is not designated for publication in the official reports.

27        [2] Because all claims against the FDIC are dismissed by this order, the FDIC's motion to
28   strike is terminated as moot.

1  has considered the moving and responding papers and the oral arguments of counsel presented at

2  the hearing on June 25, 2010. For the reasons discussed below, the motions will be granted.

3  Leave to amend will be granted only as to Jones-Boyle's first, third, and fourth claims against

4  JPMorgan.

5

6                                          **I. BACKGROUND**

7  **A.      Factual Allegations**

8          On June 6, 2007, Jones-Boyle entered into an Option Adjustable Rate Mortgage loan

9  ("Option ARM") with WaMu in the amount of $1,000,000, which was secured by her primary

10 residence in Baldwin, Maryland (the "Property"). (SAC ¶ 5.) The loan gave the borrower four

11 monthly payment options: (1) minimum payment, (2) an interest-only payment, (3) payment on a

12 30-year amortization, and (4) payment on a 15-year amortization. (SAC ¶ 16.) Jones-Boyle chose

13 the minimum payment option.

14         Jones-Boyle alleges that she and a putative class of Option ARM loan borrowers chose

15 the minimum payment option each month because they were not properly informed about the

16 terms of the loan. Jones-Boyle claims that the minimum payment schedule provided to her by

17 WaMu was not based on the interest rate disclosed in the loan or the Truth in Lending Disclosure

18 Statement ("TILDS"). (SAC ¶ 25.) According to Jones-Boyle, the payment schedule failed to

19 "clearly, conspicuously, and accurate[ly] disclose a payment amount that corresponds to the

20 actual interest rate being charged on the loan sufficient to pay both principal and interest." (Pl.'s

21 Opp'n 2:22-24, Mar. 19, 2010.) Jones-Boyle also alleges that the TILDS contained language that

22 led her to believe that the payment option listed was the only option available at consummation

23 of the loan (SAC ¶ 31), and it did not disclose that the minimum monthly payments would be

24 insufficient to pay both interest and the principal balance, resulting in a loss of equity known as

25 "negative amortization." Finally, Jones-Boyle alleges that WaMu's application of her minimum

26 monthly payment to interest only breached WaMu's contractual obligation to apply the payment

27 to both principal and interest every month. (SAC ¶ 95.)

28

2

1    Jones-Boyle asserts that during the loan application process, WaMu told her that the

2  Option ARM terms would allow her to lower her mortgage payments and save money, (SAC ¶

3  30), even though WaMu knew and had designed its Option ARM loans to result in and cause

4  negative amortization. (SAC ¶ 26.) She also claims that the loan terms made it difficult for her to

5  tender or refinance the loan balance back to WaMu. (SAC ¶ 20.)

6    On September 25, 2008, the Office of Thrift Supervision ("OTS") closed WaMu and

7  appointed the FDIC as receiver. (SAC ¶ 41.) That same day, JPMorgan and FDIC entered into a

8  Purchase & Assumption Agreement. The Purchase & Assumption Agreement allowed JPMorgan

9  to purchase WaMu's assets, mortgage servicing rights, and obligations, including WaMu's

10  portfolio of Option ARM loans.

11    Jones-Boyle asserts that JPMorgan entered into the Purchase & Assumption Agreement

12  knowing the defects, fraudulent omissions, and misleading nature of WaMu's Option ARM

13  loans, as well as WaMu's deceptive conduct in marketing and selling these loans. (SAC ¶ 38.)

14  After it acquired ownership and servicing rights of her loan, JPMorgan did not apply Jones-

15  Boyle's monthly payments to interest and principal, nor did JPMorgan cure or remedy the alleged

16  omissions and defects in the loan. (SAC ¶ 44.)

17    Jones-Boyle and the putative class claim that WaMu and JPMorgan, through their alleged

18  actions, obtained additional payments, fees, and increased equity positions in property secured by

19  the Option ARM loans. (SAC ¶ 49.)

20  **B.    Procedural History**

21    The instant action initially was filed by Veronica Jordan, a citizen of California, naming

22  WaMu as the sole defendant. (Compl., Apr. 24, 2008.) On June 6, 2008, the complaint was

23  amended to add  Jones-Boyle, a citizen of Maryland, as a named plaintiff. (First Am. Compl.,

24  June 6, 2008.) WaMu subsequently went into receivership. At the request of the FDIC in its

25  capacity as receiver, the Court stayed the action until October 9, 2009 so that the FDIC's

26  mandatory administrative claims process could be exhausted. (Order Granting Stay Mot., Jan. 15,

27  2009.) The FDIC disallowed Jones-Boyle's claim on July 20, 2009.

28

3

1    On December 9, 2009, Jones-Boyle filed the operative SAC, removing Jordan as a named

2   plaintiff and adding JPMorgan as a defendant as the "owner, assignees, and servicer of the

3   Option ARM loans...." (Pl.'s Opp'n 1:4-5.) Jones-Boyle alleges claims on behalf of herself and

4   others similarly situated for: (1) violation of the Truth in Lending Act ("TILA"), 15 U.S.C. §

5   1601, *et seq.*; (2) fraudulent omissions; (3) violation of California Business and Professions code

6   §§ 17200, 17500, *et seq.* ("UCL") by unfair and fraudulent business acts or practices; and (4)

7   breach of contract and the implied covenant of good faith and fair dealing.

8                                    **II. MOTIONS TO DISMISS**

9          As explained below, the Court concludes that all of Jones-Boyle's claims against the

10   FDIC are barred or preempted by statute and cannot be saved by amendment. The Court also

11   concludes that JPMorgan's motion is well taken, but that leave to amend is appropriate as to

12   Jones-Boyle's first, third, and fourth claims.

13   **A.     Legal Standards**

14          **1.     Rule 12(b)(6)**

15          "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a

16   cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v.*

17   *Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  For purposes of a motion to

18   dismiss, "all allegations of material fact are taken as true and construed in the light most

19   favorable to the nonmoving party." *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir.

20   1996). However, "the tenet that a court must accept as true all of the allegations contained in a

21   complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

22   Thus, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed

23   factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'

24   requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

25   of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Only a complaint

26   that states "a plausible claim for relief survives a motion to dismiss." *Iqbal,* 129 S. Ct. at 1950.

27          The plausibility analysis is "context-specific" and is guided by the Court's "judicial

28

4

experience and common sense," *id.,* and is limited to the face of the complaint and matters judicially noticeable, *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986)*; N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). Leave to amend must be granted unless it is clear that the complaint's deficiencies cannot be cured by amendment. *Lucas v. Dep't. of Corrs.*, 66 F.3d 245, 248 (9th Cir.1995).

In assessing whether to grant leave to amend, the Court also considers "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party[,] and futility of the proposed amendment." *Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1052 (9th Cir. 2001) (quoting *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 538 (9th Cir. 1989)).  When amendment would be futile, dismissal may be ordered with prejudice.  *Dumas v. Kipp*, 90 F.3d 386, 393 (9th Cir. 1996).

When an allegation of fraud or mistake is made, Fed. R. Civ. P. 9(b) requires the pleader "state with particularity the circumstance constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Additionally, "Rule 9(b) does not allow a complaint to merely lump multiple defendants together but requires plaintiffs to differentiate their allegation when suing more than one defendant...and inform each defendant separately of the allegations surrounding his alleged participation in the fraud." *Schwartz v. KPMG*, 476 F.3d 756, 764-65 (9th Cir. 2006). This heightened pleading standard of Rule 9(b) serves three purposes:

> (1) to provide defendants with adequate notice to allow them to defend the charge and deter plaintiffs from the filing of complaints as a pretext for the discovery of unknown wrongs; (2) to protect those whose reputation would be harmed as a result of being subject to fraud charges; and (3) to prohibit...plaintiff[s] from unilaterally imposing upon the court, the parties and society enormous social and economic cost absent some factual basis.

*Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009).

5

1

### 2.   Preemption under the Home Owners' Loan Act

"[T]he laws of the United States . . . shall be the supreme law of the land; . . . any Thing in the Constitution or laws of any state to the contrary notwithstanding." U.S. Const., art. VI, cl. 2. The Constitution through the Supremacy Clause allows for federal law and regulations to preempt state laws, however, "[i]t will not be presumed that a federal statute was intended to supersede the exercise of the power of the state unless there is a clear manifestation of intention to do so." *Schwartz v. Texas*, 344 U.S. 199, 202-03 (1952). For such a manifestation, courts look to the congressional intent to preempt, which may either be "explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Fid. Federal Sav. & Loan Assn. v. De La Cuesta*, 458 U.S. 141, 152-53 (1982). A federal agency regulation also may result in preemption. *Gibson v. World Sav. & Loan Assn.*, 128 Cal. Rptr. 2d 19, 23 (Cal Ct. App. 2002). However, instead of looking to congressional authorization to preempt, courts consider whether (1) the agency intended its regulation to have a preemptive effect, and (2) the agency acted within the scope of its congressionally delegated authority by issuing the preemptive regulation. *De La Cuesta*, 458 U.S. at 154. If these conditions are met, "[f]ederal regulations have no less pre-emptive effect than federal statutes." *Id.* at 153. The construction of statutes, legislative intent, interpretation of administrative regulations are all questions of law.  *See Bravo Vending v.  City of Rancho Mirage*, 16 Cal. Rptr. 2d 164, 166-67 (Cal. Ct. App. 1993).

While preemption analysis begins with the presumption that Congress did not intend to supplant state law, this presumption is  "not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000). *See Bank of Am. v. City & County of San Francisco*, 209 F.3d 551, 558 (9th Cir. 2002). "Congress has legislated in the field of banking from the days of *McCulloch v. Maryland*, 17 U.S. 316, 325-26 (1819), creating an extensive federal statutory and regulatory scheme." *Bank of Am.,* 209 F.3d at 558. Congress enacted the Home Owners' Loan Act of 1933 ("HOLA"), 12 U.S.C. § 1461 (2006), *et seq.,* to charter savings associations during a time of economic uncertainty for state-chartered savings associations. *See Silvas v. E\*Trade Mortg. Corp.*, 514 F.3d 1001, 1005-06

6

(9th Cir. 2008). HOLA was crafted in part to restore public confidence in a network of centrally regulated federal savings and loan associations. *Id.*  Through HOLA and its implementing regulation, 12 C.F.R § 560, Congress authorized and delegated power and authority to OTS to regulate and govern "every federal savings and loan association from its cradle to its corporate grave." *De La Cuesta,* 548 U.S. at 145. *See* 12 C.F.R. §§ 500.1(a) (the OTS "is responsible for the administration and enforcement of the [HOLA]"), 500.10 (the functions of the OTS are to "charter, supervise, regulate and examine Federal savings associations.").[3]

As relevant here, HOLA sets forth "without limitation" examples of the types of state laws that are expressly preempted. § 560.2(b):

> The terms of credit, including amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate, balance, payments due, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan;
> ...
> Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents and laws requiring creditors to supply copies of credit reports to borrowers or applicants;
> ...
> Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages;

Section 560.2(b)(4), (b)(9)-(10).

However, HOLA preemption of state laws affecting federal savings associations is not absolute. Section 560.2(c) carves out state laws that "only *incidentally* affect the lending

---

[3] Recognizing a clear intent for regulatory preemption under § 560.2(a):

> OTS is authorized to promulgate regulations that preempt state laws affecting the operations of federal savings associations when deemed appropriate to facilitate the safe and sound operation of federal savings associations, to enable federal savings associations to conduct their operations in accordance with the best practices of thrift institutions in the United States, or to further other purposes of the HOLA.

operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section." (Emphasis added). The Ninth Circuit has given further guidance with respect to whether a state law is preempted by HOLA:

> [T]he first step will be to determine whether the type of law in question is listed in paragraph (b) [of 12 C.F.R. § 560.2]. If so, the analysis will end there; the law is preempted. If the law is not covered by paragraph (b), the next question is whether the law affects lending. If it does, then, in accordance with paragraph (a), the presumption arises that the law is preempted. This presumption can be reversed only if the law can clearly be shown to fit within the confines of paragraph (c). For these purposes, paragraph (c) is intended to be interpreted narrowly. Any doubt should be resolved in favor of preemption.

*Silvas*, 514 F.3d at 1005 (quoting OTS, *Final Rule,* 61 Fed. Reg. 50951, 50966-67 (Sept. 30, 1996)).

**B.      FDIC's Motion to Dismiss**

**1.      TILA violation (Claim 1)**

Jones-Boyle asserts a TILA claim against WaMu and JPMorgan, seeking rescission, injunctive relief, and damages. (SAC ¶ 84.) However, when WaMu was shut down by OTS and placed in receivership, it became subject to the Financial Institutions Reform Recovery and Enforcement Act of 1989, Pub. L. No. 101-73, 103 Stat. 183 (1989) ("FIRREA"). Under FIRREA, the FDIC's role was to wind up WaMu's business affairs. As part of that process, the FDIC entered into a Purchase & Assumption Agreement with JPMorgan. Under that agreement, JPMorgan assumed no liabilities arising from WaMu's Option ARM program, and the FDIC assumed sole responsibility for claims arising from WaMu's activities prior to September 25, 2009.

It has been observed that "the world changes when a bank goes into receivership," *FDIC v. Shain, Schaffer & Rafanello*, 944 F.2d 129, 134 (3d Cir. 1991). 12 U.S.C. § 1821(j) provides in part: "[e]xcept as provided in this section, no court may take any action, except at the request of the Board of Directors by regulation or order, to restrain or affect the exercise of powers or

functions of the Corporation [FDIC] as a conservator or receiver." In *Sahni v. American Diversified Partners*, 83 F.3d 1054, 1058-59 (9th Cir. 1996), the Ninth Circuit recognized that:

> Congress has granted the FDIC as receiver excess statutory authority to dispose of receivership assets, thereby reducing the losses borne by federal taxpayers when federally insured financial institutions...fail....It is well-established that § 1821(j) bars restraint by the courts on the statutory powers of the FDIC when it acts as receiver....12 U.S.C. § 1821(j) bars the remedy of rescission....

It is apparent that any equitable remedy against the FDIC arising from Jones-Boyle's TILA claim would restrain the FDIC's statutory powers. *See, e.g., Hansen v. FDIC*, 113 F.3d 866, 871-72 (8th Cir. 1997); *Freeman v. FDIC*, 56 F.3d 1394, 1399 (D.C. Cir. 1995) ("Not only does [§ 1821(j)] bar injunctive relief, but in the circumstances of the present case where appellants seek a declaratory judgment that would effectively 'restrain the FDIC from foreclosing on their property, § 1821(j) deprives the court of power to grant that remedy as well."); *Lloyd v. FDIC*, 22 F.3d 335, 336 (1st Cir. 1994) (holding that § 1821(j) bars suit for injunctive relief); *Russell v. Indymac Bank, FSB*, No. 09-03134, 2010 U.S. Dist. LEXIS 38759, at * 3 (N.D. Cal. Apr. 20, 2010).

Jones-Boyle's claim for damages against the FDIC is barred by 15 U.S.C. §§ 1641(a) and (e), pursuant to which involuntary assignees are not subject to TILA damages. Under § 1641(a), "[A]ny civil action for a violation of [TILA] which may be brought against a creditor may be maintained against any assignee of such creditor only if the violation for which such action or proceedings is brought is apparent on the face of the disclosure statement, except where the assignment was *involuntary*." (Emphasis added).

*Sharpe v. FDIC*, 126 F.3d 1147 (9th Cir. 1997), upon which Jones-Boyle relies, is factually distinguishable. The plaintiffs in *Sharpe* were borrowers who had entered into a settlement agreement with their lender. 126 F.3d at 1150. Pursuant to the settlement agreement, the plaintiffs executed a note, deed of trust and reconveyance documents. In exchange, the lender delivered two bank cashier's checks for $510,000. *Id.* at 1151. Shortly thereafter, the bank failed,

and the FDIC was appointed as receiver. *Id.* The FDIC notified plaintiffs that their checks would not be honored and recorded title on the plaintiffs' property. *Id.* The plaintiffs sued the FDIC for breach of contract and rescission. The court held that plaintiffs' claim for *breach of contract* "is not affected by the jurisdictional bar imposed by § 1821(j), but the claims for rescission and declaratory relief must fall under an exception to § 1821(j) in order to survive. The bar imposed by § 1821(j) does not extend to situations in which the FDIC as receiver asserts authority beyond that granted it as receiver....Although the statute clearly contemplates the FDIC can escape the obligations of contracts, it may do so only through the prescribed mechanism." *Id.* at 1155. Jones-Boyle does not contend, nor does it reasonably appear that she could, that FDIC breached any agreement between herself and WaMu, nor does she claim that the FDIC has acted outside the scope of its delegated authority.

### 2.    Fraudulent omissions, violation of California Business and Professions Code, and breach of contract (Claims 2, 3 and 4)

Jones-Boyle also asserts state-law claims for fraudulent omissions (claim 2), violation of the UCL (claim 3), and breach of contract and the implied covenant of good faith and fair dealing (claim 4). Specifically, Jones-Boyle alleges that WaMu created, designed, and marketed Option ARM loans for the purpose of causing negative amortization despite its promises of "low, fixed payment, with only a small annual increase...for a period of 3 to 5 years; and that the payment amount would be based on the listed interest rate." (SAC ¶ 143.) The FDIC contends that because WaMu was a federally-chartered savings association regulated by the OTS, Jones-Boyle's state-law claims are preempted by HOLA. The Court agrees.

Although Jones-Boyle invokes broad state laws of general applicability, the Ninth Circuit recognized in *Silvas* that HOLA preemption still may apply. 514 F.3d at 1005. *Accord Casey v. FDIC*, 583 F.3d 586, 593-94 (8th Cir. 2009); *State Farm Bank, FSB v. District of Columbia*, 640 F. Supp. 2d 17, 23 (D.D.C. 2009). Jones-Boyle relies upon this Court's decision in *Mandrigues v. World Savings, Inc.*, No. 07-4497, 2008 U.S. Dist. LEXIS 31810 (N.D. Cal. Apr. 9, 2008) which concluded on the facts alleged at the pleading stage that the plaintiff's state-law claims for

breach of contract, fraudulent concealment, and violations of the UCL were not necessarily preempted by HOLA. While the plaintiff in *Mandrigues* also complained of a bank's lending practices and promises of applying payments to interest and principal, the Court noted that "Plaintiffs allege claims based upon the 'generally applicable duty to refrain from unfair and deceptive business practices.'" 2008 U.S. Dist. LEXIS 31810, at *8. Because the UCL claim was not clearly preempted, the breach of contract claim also survived, as the allegations of breach also could be read as involving non-lending activities. *Id.* at *8-9. In contrast, Jones-Boyle's state-law claims against WaMu are based upon solely its lending activities and representation in loan documents.

Jones-Boyle also argues that the framework articulated by the Seventh Circuit *In re Ocwen Loan Servicing LLC Mortgage Servicing Litigation*, 491 F.3d 638 (7th Cir. 2007) should be applied to the preemption analysis here. However, this Court is not at liberty to disregard the approach adopted by the Ninth Circuit in *Silvas*. Examining Jones-Boyle's fraudulent omissions claim in light of *Silvas*, it is apparent that the claim is preempted by §§560.2(b)(4) and 560.2(b)(9). Jones-Boyle alleges non-disclosure of negative amortization in the loan documents, non-disclosure of different monthly payment options and their respective effect over the life of the loan, misleading statements in the loan documents as to how monthly payments would be applied, and misleading representations as to the interest rate in credit documents. Applying state law to these claims clearly would impose requirements on a federal savings association and affect its "terms of credit, including amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate, balance...or term to maturity of the loan[,]" §560.2(b)(4), as well as its "[d]isclosure[s] and advertising...included in...credit contracts, or other credit-related documents[,]" § 560.2(b)(9). *See Conder v. Home Sav. of Am.*, 680 F. Supp. 2d 1168, 1175 (C.D. Cal. 2009) ("Plaintiff's fraudulent omissions claim is based on his allegations that [Defendant] failed to disclose that the 1.25% interest rate would only apply for one month and the scheduled monthly payments would be insufficient to pay both principal and interest.")

Jones-Boyle's claim that WaMu violated the UCL in its marketing of Option ARM loans

also is preempted by HOLA. Requiring WaMu to comply with state laws with respect to the means by which it advertises, discloses, processes, and extends terms of credit conflicts directly with federal law. A number of other district courts within the Ninth Circuit have concluded that UCL claims with similar allegations are preempted. *See Newbeck v. Wash. Mut. Bank*, No. 09-1599, 2010 U.S. Dist. LEXIS 3830, at *14 (N.D. Cal. Jan. 19, 2010); *Hava v. U.S. Bancorp.*, No. 09-3855, 2009 U.S. Dist. LEXIS 119857, at *24-25 (N.D. Cal. Dec. 22, 2009);  *Carnero v. Weaver*, No. 09-1995, 2009 U.S. Dist. LEXIS 117957, at *7-9 (N.D. Cal. Dec. 18, 2009); *Buick v. World Sav. Bank*, 637 F. Supp. 2d 765, 774 (E.D. Cal. 2008) (holding UCL claim based on savings association's advertising practices were preempted by HOLA).

Jones-Boyle's remaining state-law claim against WaMu alleges breach of contract and the implied covenant of good faith and fair dealing. This claim is based entirely on the Note and the TILDS. (SAC ¶ 172-74.) Jones-Boyle alleges that the interest rate in these documents did not apply to the payment schedule and that "WaMu...knew that the payment schedule was not based on the interest rate listed" but on a lower rate "which caused the loan contract to be uncertain and ambiguous as to the amount borrowers would have to pay each month in order to avoid negative amortization." (SAC ¶ 167.) Jones-Boyle also claims that "[WaMu] expressly and/or through its conduct and actions agreed that Plaintiff's monthly payment obligations would be sufficient to pay both the principal and interest owed on the loan." (SAC ¶ 171.) These allegations are premised on WaMu's conduct "processing, originat[ing], and servicing...mortgages" and its disclosures in credit-related documents. *See* § 560.2(b)(9)-(10). Accordingly, the contract-based claims also are preempted.

**B.      JPMorgan's Motion To Dismiss**

      **1.      TILA violation (Claim 1)**

Jones-Boyle asserts that the Purchase & Assumption Agreement between the FDIC and JPMorgan does not bar her claims because "[p]arties cannot contract away obligations imposed

by federal law."[4] (Pl.'s Opp'n 8:3.) Article 2.5 of the Agreement states:

> [A]ny liability associated with borrower claims for payment of or liability to any borrower, whether or not such liability is reduced to judgment, liquidated or unliquidated...legal or equitable...related in any way to any loan or commitment to lend made by the Failed Bank [WaMu] prior to failure, or to any loan made by a third party in connection with a loan which is or was held by the Failed Bank, or otherwise arising in connection with the Failed Bank's lending or loan purchase activities are specifically not assumed by the Assuming Bank [JPMorgan].

(JPMorgan Mot. Dismiss 5:1-7, Feb. 1, 2010.)

It is clear from the terms of the Agreement that JPMorgan did not assume any of the liabilities arising from TILA claims brought by WaMu's borrowers. *See* 12 U.S.C. §§ 1821(d)(A)-(B), (G) (The FDIC as Receiver succeeds to "all rights, titles, powers and privileges of" the failed bank, and has power to transfer assets and liabilities through assumption agreements.); *West Park Assocs. v. Butterfield Sav. & Loan Ass'n*, 60 F.3d 1452, 1459 (9th Cir. 1995); *Hilton v. Wash. Mut. Bank*, No. C 09-1191 SI, 2009 WL 3485953, at *2 (N.D. Cal. Oct. 28, 2009). In *West Park*, the Ninth Circuit upheld an assumption agreement similar to the one at issue here in which the FDIC as receiver for a failed bank transferred all liabilities except for any claims by the failed bank's shareholders. *Id.* at 1458. In rejecting the shareholders' claims against the assuming bank, the Ninth Circuit held that a finding in favor of the shareholders would undermine the statutory power of the FDIC. *Id* at 1459. Pursuant to this authority, the Court concludes that the Agreement between FDIC and JPMorgan is valid and enforceable.

Article 2.5 of the Agreement bars claims against JPMorgan for the conduct, actions, omissions of WaMu *before* September 25, 2008. However, actions by JPMorgan *after* assuming Jones-Boyle's loan are not be barred. Jones-Boyle contends that JPMorgan violated TILA after September 25, 2008 by continuing to service her loan in the same manner as WaMu without

---

[4] JPMorgan argues that the Purchase & Assumption Agreement also protects it against conflictive obligations imposed by state law.

13

correcting WaMu's omissions and misleading statements. JPMorgan asserts several defenses against these claims.

First, JPMorgan argues that Jones-Boyle's TILA damages are time-barred. *See* 15 U.S.C. § 1640(e). Jones-Boyle consummated her loan with WaMu on June 6, 2007 and first asserted a TILA damages claim in her first amended complaint on June 6, 2008. *See King v. State of Cal.*, 784 F.2d 910, 915 (9th Cir. 1986) ("hold[ing] that limitations period in Section 1640(e) runs from the date of consummation of the transaction but that the doctrine of equitable tolling may, in the appropriate circumstances, suspend the limitations period until the borrower discovers or had reasonable opportunity to discover the fraud or nondisclosures that form the basis of the TILA action."). JPMorgan was not added as a defendant until the filing of the SAC on December 29, 2009. Jones-Boyle's claims against JPMorgan do not relate back to her claim against WaMu, nor would it be appropriate to apply the doctrine of equitable tolling. JPMorgan began servicing Jones-Boyle's loan approximately three months after Jones-Boyle commenced the instant action, and she obviously believed that her loan violated TILA when she did so.

Jones-Boyle also seeks rescission of her loan under TILA. Such claims are subject to a three-year limitations period, *see* 15 U.S.C. § 1635(f), and plaintiffs seeking rescission must plead that they are able to return the principal of the mortgage loan (minus the appropriate interest and fees), *see* 15 U.S.C. § 1635(b). Jones-Boyle's rescission claim against JPMorgan is based on her allegation that JPMorgan owns and continues to service a loan that violates TILA. JPMorgan contends that the equitable remedy of rescission is barred by the terms of the Purchase & Assumption Agreement.

However, "equity looks through forms to substance." *Texas v. Hardenburg*, 77 U.S. 88, 89 (1869). The FDIC no longer owns Jones-Boyle's loan, and JPMorgan is claiming protection under the Purchase & Assumption Agreement. Accepting JPMorgan's argument would leave Jones-Boyle with no remedy at all, even if she could show that JPMorgan is committing ongoing TILA violations. *See Allen v. United Fin. Mortgage Corp.*, No. 09-2507, 2010 WL 1135787, at *7 (N.D. Cal. March 22, 2010) (dismissing damage claim against defendant JP

14

Morgan Chase Bank but not rescission claim under TILA). 12 U.S.C. § 1821(j) bars the remedy of rescission judicially imposed on the FDIC, but as the FDIC makes clear "FDIC no longer holds Plaintiff's loan..." (FDIC Mot. Dismiss 5:21-22, Feb. 1, 2010.) The Court finds *Allen* instructive and persuasive. *See also Ambassador Hotel Co. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1031. (9th Cir. 1999) ( "Under true rescission, the plaintiff returns to the defendant the subject of the transaction, plus any other benefit received under the contract, and the defendant returns to the plaintiff the consideration furnished, plus interest.").

A borrower must allege an ability to return the principal of the loan in order for a court to consider rescission under TILA. 15 U.S.C. § 1635(b). *See Yamamoto v. Bank of N.Y.*, 328 F.3d 1167, 1171-72 (9th Cir. 2003). In addition, 15 U.S.C. § 1635(f) permits rescission only when the lender fails to make "material disclosures."  Although the SAC is defective in both respects, Jones-Boyle may be able to amend her pleading to cure the defects.

## 2.    Fraudulent omissions (Claim 2)

Under California law, the elements of a common-law claim for fraudulent omission are as follows: (1) the defendant concealed or suppressed a material fact; (2) the defendant was under a duty to disclose the fact to the plaintiff; (3) the defendant intentionally concealed or suppressed the fact with intent to defraud the plaintiff; (4) the plaintiff was unaware of the fact and would have acted differently, if he had known of the concealed or suppressed fact; and (5) as a result of the concealment or suppression the plaintiff sustained damage. *See Terra Ins. Co. v. New York Life Inv. Mgmt. LLC*, No. 09-1609, 2010 WL 1910057, at * 6 (N.D. Cal. May 11, 2010); *Hovsepian v. Apple, Inc.*, No. 08-5788, 2009 WL 5069144, at *5 (N.D. Cal. Dec. 17, 2009); *Hahn v. Mirda*, 54 Cal. Rptr. 3d 527, 532, (Cal App. Ct. 2007).

Jones-Boyle claims that "Defendants had a duty to disclose to Plaintiff, and at all times relevant, failed to disclose and/or concealed material facts by making partial misrepresentations of some material facts when Defendants had exclusive knowledge of material facts...." (SAC ¶ 129; Pl.'s Opp'n 24:18-24). However, her allegations lack particularity with respect to any of the elements of a fraudulent omission claim. Jones-Boyle also conflates the actions of WaMu

15

and JPMorgan by alleging that "Defendants purposefully and intentionally devised this Option ARM loan scheme to defraud and/or mislead consumers..." (SAC ¶ 133.) Although, she alleges exclusively that WaMu sold and marketed her loan (SAC ¶ 32), there are no factual allegations with respect to JPMorgan's purported fraudulent intent.

While such defects might in some circumstances be curable by amendment, the Purchase & Assumption Agreement expressly prevents Jones-Boyle from asserting claims against JPMorgan for the conduct of WaMu. Thus, any fraudulent omission made by JPMorgan must involve the servicing of Jones-Boyle's loan. The first complaint in which Jones-Boyle is named as a plaintiff was filed on June 6, 2008, three months before JPMorgan assumed the loan. Under these circumstances, Jones-Boyle cannot allege reliance on the alleged fraudulent omission by JPMorgan.

### 3.    UCL (Claim 3)

The UCL prohibits any "unlawful, unfair or fraudulent business practices." *Cel-Tech Commc'ns, Inc. v Los Angeles Cellular Tel. Co.*, 5973 P.2d 527, 539 (Cal. 1999).  Because the statute is written in the disjunctive, it applies separately to business practices that are (1) unlawful, (2) unfair, or (3) fraudulent. *See Pastoria v. Nationwide Ins.*, 6 Cal. Rptr. 3d, 148, 152 (2003).  Jones-Boyle alleges that JPMorgan's conduct violated all three prongs. However, JPMorgan points out that because (1) Jones-Boyle is a resident of Maryland; (2) the subject loan was entered into in Maryland; (3) the loan secures property in Maryland (SAC ¶ 5), and (4) JPMorgan is not a citizen of California, Jones-Boyle lacks standing to assert UCL claims. The Court agrees.

While the Court accepts as true Jones-Boyle's assertion that JPMorgan has significant business contacts in California, "[t]he existence of personal jurisdiction over a defendant does not alone permit application of the forum law to the claims of nonresident plaintiffs." *Tidenburg v. Bidz, Inc.*, No. 08-5553, 2009 WL 605249, at *4 (C.D. Cal. Mar. 4, 2009) (dismissing Texas plaintiff's UCL claim where plaintiff did not allege she was injured by defendant's conduct in California). As the California Court of Appeal observed in *Northwest Mortgage, Inc. v.*

*Superior Court*, 85 Cal. Rptr. 2d 18, 22-23 (Cal. App. Ct. 1999), the UCL was neither designed nor intended to regulate claims of nonresidents arising from conduct occurring entirely outside of California. *See also Tidenburg*, 2009 WL 605249, at *4. Jones-Boyle relies upon *Diamond Multimedia Systems Inc. v. Superior Court*, 968 P.2d 539 (Cal. 1999), but a careful reading of that case makes clear that JPMorgan's business contacts in California do not automatically give Jones-Boyle standing to assert a UCL claim. "The linchpin of *Diamond's* analysis is that state remedies may be invoked by out-of-state parties when they are harmed by wrongful conduct *occurring in California*." *Nw. Mortgage, Inc.,* 85 Cal. Rptr.2d at 224 (emphasis added); *see also Standfacts Credit Servs., Inc. v. Experian Info. Solutions, Inc.*, 405 F. Supp. 2d 1141, 1148 (C.D. Cal. 2005), aff'd 294 Fed. Appx. 217 (9th Cir. 2008); *Speyer v. Avis Rent a Car Sys., Inc.*, 415 F. Supp. 2d 1090, 1098-99 (S.D. Cal. 2005).

Here, Jones-Boyle has failed to identify any activity of JPMorgan in California that has caused her injury. Instead, Jones-Boyle asserts that if her proposed plaintiff class is considered, JPMorgan's conduct likely would affect California class members. (Pl.'s Opp'n 28:3-5.) This may be true, but it is immaterial to the question of whether *Jones-Boyle* has standing. Jones-Boyle alleges that because WaMu is headquartered in Chatsworth, California[5] and the Option ARM loans at issue originally were held by WaMu, JPMorgan is subject to UCL claims under the Purchase & Assumption Agreement. However, as explained previously, the Agreement bars all claims against JPMorgan arising prior to September 25, 2008. The SAC contains no allegations against JPMorgan concerning conduct after that date that would give rise to a UCL claim.

Jones-Boyle asks that she be permitted to amend her UCL claim to allege additional information recently made known to her. (Pl.'s Opp'n 29:27-30:2.) This request is reasonable and will be granted.

---

[5] JPMorgan contends that in fact WaMu is incorporated in Nevada and headquartered in Washington. (JPMorgan Mot. Dismiss 11:n.5.)

17

**4.      Breach of Contract and the Implied Covenant of Good Faith and Fair**

**Dealing (Claim 4)**

Jones-Boyle alleges that, "as the servicer and owner of the Option ARM loans, Chase [JPMorgan] is obligated to properly apply Plaintiff and Class Members' payments" (SAC ¶ 170), and that JPMorgan breached its contract and the implied covenant of good faith and fair dealing under California law. However, there is confusion in the moving and responding papers as to whether California or Maryland law applies to the claim, and the parties have briefed the applicable law of both states.

When exercising supplemental jurisdiction over state claims, "the federal court applies the choice-of-law rules of the forum state...." *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996). Under California Civil Code § 1646, "A contract is to be interpreted to the law and usage of the place where it is to be performed; or if it does not indicate a place of performance, according to the law and usage of the place where it is made." Jones-Boyle entered into the subject loan with WaMu in Maryland, and the loan secured property located in Maryland. Jones-Boyle was required to remit monthly payments to a post office box in Arizona. Nothing in these facts supports a choice of California law. Accordingly, absent a choice-of-law clause in the loan documents, Maryland law governs.

"Maryland adheres to the principle of the objective interpretation of contracts. The court will 'give effect to the clear terms of the contract regardless of what the parties to the contract may have believed those terms to mean.'" *Clancy v. King*, 954 A.2d 1092, 1101 (Md. 2008) (Citation omitted). Under Maryland law, the meaning of a contract is focused on the "four corners of the agreement." *Id.* "Effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *Id.* Jones-Boyle's breach of contract claim against JPMorgan alleges that JPMorgan failed to apply Jones-Boyle's monthly payments to both her principal and interest. Jones-Boyle also alleges a breach of contract because the scheduled payment provided in the loan documents was not based on the disclosed

18

interest rate. Jones-Boyle fails to state a claim on either ground.

District courts confronted with identical claims and similar loans have concluded that a careful reading of the loan documents taken as a whole undermines any breach of contract claim, even though the loan documents "may have been less than clear and conspicuous as required by TILA...." *Amparan v. Plaza Home Mortgage, Inc.*, 678 F. Supp. 2d 961, (N.D. Cal 2008); *see also Plascenia v. Lending 1st Mortgage*, 583 F. Supp. 2d 1090, 1101 (N.D. Cal. 2008) ("Plaintiffs may be able to show that, considered as a whole, the disclosures provide confusing and seemingly contradictory information concerning the terms of the loan, the disclosures nonetheless accurately describe the relationship between the minimum monthly payment and the accrued interested."); *Quezada v. Loan Ctr. of Cal., Inc.*, No. 08-177, 2008 U.S. Dist. LEXIS 96479, at *18-19 (E.D. Cal. Nov. 26, 2008). The Court reaches the same conclusion here.

Like the note at issue in *Amparan*, Jones-Boyle's Note contains an explicit admonition that "THIS NOTE CONTAINS PROVISIONS FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN 115% OF THE ORIGINAL AMOUNT (OR $1,150,000)." The Note also provides, "[M]y monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments." (First Am. Compl. Ex. 2, 5:¶4(G).) To the extent that Jones-Boyle's breach of contract claim is based on the imposition of a different interest rate, it is further weakened by the TILDS, which states: "VARIABLE RATE; YOUR LOAN CONTAINS A VARIABLE-RATE FEATURE...."(First Am. Compl. Ex. 2, 2.)

Jones-Boyle also claims that her own promise to "pay principal and interest by making a payment every month[,]" (First Amended Compl. Ex. 2 5:¶3(A)), indicates an obligation on the part of the lender to apply payment to both interest and principal. However, the same paragraph

19

provides that, "Each monthly payment will be applied to interest before Principal." An objective construction of the Note as a whole does not preclude JPMorgan from applying Jones-Boyle's monthly payments to interest only, nor does it bar scheduled payments reflecting an interest rate different from that stated in the Note and TILDS.

Jones-Boyle also alleges a breach of the covenant of good faith and fair dealing implied in every contract under California law. *See Schwarzkopf v. Int'l Bus. Machs., Inc.*, No. 08-2715, 2101 U.S. Dist. LEXIS 46813, at *32 (N.D. Cal. May 12, 2010). However, "Maryland does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing; the allegation making up such a claim should be pursued under a plaintiff's breach of contract claim." *Magnetti v. Univ. of Md.*, 909 A.2d 1101, 1105 n.3 (Md. Ct. Spec. App. 2006); *See Swedish Civ. Aviation Admin. v. Project Mgmt. Enters.*, 190 F. Supp. 2d 785, 793-94 (D. Md. 2002) ("Maryland recognizes that every contract imposes a duty of good faith and fair dealing in its performance. However, Maryland courts have not explicitly recognized a separate cause of action for breach of this duty.").

Jones-Boyle seeks leave to amend to add a California plaintiff or to allege claims under Maryland state law. While the Court has grave doubts as to whether Jones-Boyle's contract-based claims can be amended successfully, leave to amend will be granted.

//

//

//

//

//

//

//

//

Case Number CV 08-02142 JF (PVT)
ORDER GRANTING MOTIONS TO DISMISS WITH LEAVE TO AMEND IN PART
(JFEX2)

## IV. ORDER

Good cause therefor appearing:

(1) The FDIC's motion to dismiss is GRANTED, without leave to amend.

(2) JPMorgan's motion to dismiss is GRANTED, with leave to amend in part.

(3) The FDIC's motion to strike is TERMINATED as moot.

Any amended pleading shall be filed and served within twenty (20) days of the date this order is filed.

**IT IS SO ORDERED.**

DATED: 7/7/2010

_____
JEREMY FOGEL
United States District Judge

21